## No. 21-5012

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

### STEVEN M. LARRABEE,

*Plaintiff-Appellee,*

*v.*

### CARLOS DEL TORO,
in his Official Capacity as
Secretary of the Navy, *et al.*,

*Defendants-Appellants.*

---

On Appeal from the U.S. District Court
for the District of Columbia
(No. 19-cv-654 (RJL))

# PETITION FOR REHEARING EN BANC

**Michael R. Dreeben**
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC 20006

**Eugene R. Fidell**
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, N.W., 4th Floor
Washington, DC 20036

October 17, 2022

**Stephen I. Vladeck**
*Counsel of Record*
727 E. Dean Keeton Street
Austin, TX 78705
(512) 475-9198
svladeck@law.utexas.edu

# CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES, & RULE 26.1

## I.  PARTIES AND *AMICI CURIAE*

Petitioner Steven M. Larrabee was the plaintiff in the district court and is the appellee in this Court. Respondents Carlos Del Toro (in his official capacity as the Secretary of the Navy) and the United States were defendants in the district court and are appellants in this Court.

No *amici curiae* appeared in the district court. Before the panel, briefs *amici curiae* were filed in support of Plaintiff-Appellee by the National Institute of Military Justice and by Professors Joe Wesley Moore and Joshua Kastenberg.

## II.  RULINGS UNDER REVIEW

The district court's ruling in this case, in which Judge Leon granted Plaintiff-Appellee's motion for judgment on the pleadings, is reported at 502 F. Supp. 3d 322 (D.D.C. 2020). The panel's ruling in this case, which reversed the district court, is reported at 45 F.4th 81 (D.C. Cir. 2022), and is attached to this petition as an addendum.

## III.  RELATED CASES

This case is a collateral attack on a final criminal conviction by a court-martial conducted by the U.S. Navy-Marine Corps Trial Judiciary,

which has not previously been before this Court. Plaintiff-Appellee Larrabee's appeal was docketed as No. 201700075 in the U.S. Navy-Marine Corps Court of Criminal Appeals; No. 18-0114/MC in the U.S. Court of Appeals for the Armed Forces; and No. 18-306 in the U.S. Supreme Court. There are no other related cases within the meaning of D.C. Cir. R. 28(a)(1)(C).

## IV. RULE 26.1 STATEMENT

Petitioner is not required to file a disclosure statement by Fed. R. App. P. 26.1 or D.C. Cir. R. 26.1.

Dated: October 17, 2022

By: _____

Stephen I. Vladeck
Counsel for Petitioner

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES, & RULE 26.1 ........i

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES............................................................iv

GLOSSARY ...............................................................................vi

INTRODUCTION AND RULE 35(b) STATEMENT.............................. 1

QUESTION PRESENTED .............................................................5

REASONS FOR GRANTING REHEARING EN BANC ........................5

    I.    The Panel's Ruling Would Have Stunning Implications
         for the Future of Military Jurisdiction.........................6

    II.   The Panel's Justification for Expansive Court-Martial
         Jurisdiction Conflicts With the Relevant Decisions of
         the Supreme Court ...................................................8

    III.  The Panel's Superficial Historical Analysis Does Not
         Support its Holding ................................................ 14

CONCLUSION ..........................................................................20

CERTIFICATE OF COMPLIANCE ...............................................21

CERTIFICATE OF SERVICE ........................................................22

ADDENDUM ...........................................................................1a

## Cases

*Barker* v. *Kansas*,
  503 U.S. 594 (1992) ............................................................................. 14

*Billings* v. *Truesdell*,
  321 U.S. 542 (1944) ............................................................................... 7

*Burns* v. *Wilson*,
  346 U.S. 137 (1953) ............................................................................... 8

*Ex parte Milligan*,
  71 U.S. (4 Wall.) 2 (1866) ................................................................. 18

*Kinsella* v. *United States ex rel. Singleton*,
  361 U.S. 234 (1960) ............................................................................... 9

*Larrabee* v. *Braithwaite*,
  502 F. Supp. 3d 322 (D.D.C. 2020) .............................................. 10, 18

*Larrabee* v. *Del Toro*,
  45 F.4th 81 (D.C. Cir. 2022) ....................... 1, 4, 5, 7, 9, 11, 12, 13, 14, 15

*Lee* v. *Madigan*,
  358 U.S. 228 (1958) ............................................................................. 17

*Loving* v. *United States*,
  517 U.S. 748 (1996) ............................................................................. 17

*McElroy* v. *United States ex rel. Guagliardo*,
  361 U.S. 281 (1960) ............................................................................... 9

*N.Y. State Rifle & Pistol Ass'n* v. *Bruen*,
  142 S. Ct. 2111 (2022) ......................................................................... 16

*Parker* v. *Levy*,
  417 U.S. 733 (1974) ..................................................................... 2, 8, 17

*Ramos* v. *Louisiana*,
  140 S. Ct. 1390 (2020) ......................................................................... 18

*Reid* v. *Covert*,
  354 U.S. 1 (1957) ................................................................................... 9

*United States ex rel. Toth* v. *Quarles*,
  350 U.S. 11 (1955) ................................................... 3, 7, 8, 9, 10, 11, 19

---

\*. Authorities on which this brief principally relies are marked with an asterisk.

*United States* v. *Ali*,
71 M.J. 256 (C.A.A.F. 2012) .................................................9
*United States* v. *Begani*,
81 M.J. 273 (C.A.A.F. 2021) .................................................5
*United States* v. *Briggs*,
141 S. Ct. 467 (2020) .......................................................18
*United States* v. *Dinger*,
76 M.J. 552 (N-M. Ct. Crim. App. 2017) .............................14
*United States* v. *Sineneng-Smith*,
140 S. Ct. 1575 (2020) ......................................................16
*United States* v. *Tyler*,
105 U.S. 244 (1882).........................................................14

## Statutes and Constitutional Provisions

U.S. CONST. art. I, § 8, cl. 14....................................................1
10 U.S.C.
§ 688.............................................................................7
§ 688(a).........................................................................7
§ 802(a)(1) .....................................................................3
§ 802(a)(3) .....................................................................3
§ 8385(b)......................................................................12
§ 888.............................................................................2
§ 6406(a) (repealed 1970) .................................................16
Military Extraterritorial Jurisdiction Act of 2000,
18 U.S.C. §§ 3261–67....................................................11

## Other Authorities

1 Blackstone, *Commentaries* ....................................................15
DoD Instruction 1352.01 (2016)............................................10
U.S. Dep't of Def.,
*Statistical Report on the Military Retirement System* (2022) ...............2

## GLOSSARY

**CAAF**          U.S. Court of Appeals for the Armed Forces

\* \* \*

A deeply divided panel held that the Constitution permits the armed forces to court-martial anyone who has a formal relationship with the military—even if that relationship entails nothing more than the possibility of *future* recall to active service. *See Larrabee* v. *Del Toro*, 45 F.4th 81 (D.C. Cir. 2022).[2] Under Judge Rao's majority opinion (which Judge Walker joined in pertinent part), military retirees remain part of "the land and naval Forces," U.S. CONST. art. I, § 8, cl. 14, even after they have returned to civilian life—and so can be court-martialed for offenses committed after they have retired—solely because they remain theoretically subject to future activation. 45 F.4th at 89–95. This massive and unjustified expansion of military jurisdiction—and the consequent contraction of the constitutional jury-trial rights of millions of Americans—calls out for en banc review.

As Judge Tatel observed in dissent, the majority's holding would allow the armed forces to try any of the more than two million retired servicemembers for offenses committed while they are retired—from

---

2. The slip opinion is reproduced in an addendum to this petition. For convenience, this petition cites to the officially reported version.

octogenarian Korean War veterans to permanently disabled soldiers who have been medically retired—without any showing of military necessity or attempt to explain why civilian courts are inadequate.[3] Such jurisdiction would extend not only to conventional civilian offenses with no military nexus, but to offenses civilian courts could not constitutionally try, such as using contemptuous words toward the President or other officials. *Id*. at 103 (Tatel, J., concurring in part and dissenting in part); *see* 10 U.S.C. § 888; *cf. Parker* v. *Levy*, 417 U.S. 733, 749 (1974) ("While a civilian criminal code carves out a relatively small segment of potential conduct and declares it criminal, the Uniform Code of Military Justice essays more varied regulation of a much larger segment of the activities of the more tightly knit military community.").

Beyond retirees, the majority's analysis would also authorize Congress to subject the 1.1 million current *reservists* to court-martial for offenses committed while they are inactive—and not just, as current law provides, only while they are on active duty or performing inactive-duty

---

3. There were 2,179,710 retired servicemembers as of September 30, 2021. *See* U.S. Dep't of Def., *Statistical Report on the Military Retirement System* 23 (2022), https://media.defense.gov/2022/Oct/12/2003094706/-1/-1/0/MRS%20STATRPT%202021%20V999.PDF.

training drills. *See* 10 U.S.C. § 802(a)(1), (3). Indeed, although the majority claimed otherwise, its reasoning would allow Congress to authorize courts-martial in perpetuity for the 16 million men who are statutorily required to register in the Selective Service System, even if they are *never* inducted into the armed forces; they too have a "relationship" to the armed forces that subjects them to the possibility of being involuntarily called to active service in the future.

Rehearing en banc is warranted because, as these implications underscore, the panel's analysis raises a question of exceptional importance. It also conflicts with the Supreme Court's repeated admonition that the Constitution limits courts-martial to "the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service." *United States ex rel. Toth* v. *Quarles*, 350 U.S. 11, 22 (1955). *Toth* held that the Constitution bars the court-martial of former servicemembers for offenses committed while on active duty, at least in part because such a rule would have subjected millions of additional Americans to military jurisdiction. *See id*. at 19. Further review is warranted because the majority's analysis would sustain a comparable (if not greater) expansion.

The panel majority justified its break with *Toth* on the ground that Founding-era practice supports its bottom line. But the panel drew the wrong conclusions from that history—which neither party had briefed.

First, the panel relied on Parliament's brief authorization of courts-martial for "half-pay officers" (who were not in active service) from 1749–51. But by the time the U.S. Constitution was ratified, more than three decades had elapsed since Parliament had *abandoned* that practice—entirely in response to public opposition to such jurisdiction. And second, the panel also looked to courts-martial of "furloughed" soldiers during the Revolutionary War, even though those limited examples *all* involved active-duty troops temporarily excused from duty—soldiers who formally remained in active service even while physically away from the front. Whether or not these historical practices are relevant here, correctly understood, they undercut, rather than support, the panel's conclusions.

The panel's decision effects a "dramatic expansion of court-martial jurisdiction . . . beyond what the Constitution allows and case law supports." 45 F.4th at 101 (Tatel, J., concurring in part and dissenting in part). And it defends that expansion with flawed doctrinal and historical reasoning. The petition for rehearing en banc should be granted.

4

Whether the Constitution allows the armed forces to court-martial retirees for offenses committed once they have retired and returned to civilian life only because they are subject to the possibility of future recall to active duty?

## REASONS FOR GRANTING REHEARING EN BANC

The importance of the question presented is beyond dispute. Recent years have seen a significant increase in the courts-martial of retired servicemembers for offenses committed while retired. The Court of Appeals for the Armed Forces (CAAF) recently upheld such prosecutions, relying heavily on the substantial deference that it believed Congress was owed in identifying who could be tried by court-martial. *See United States* v. *Begani*, 81 M.J. 273, 277–80 (C.A.A.F. 2021). But the panel in this case specifically *rejected* CAAF's reasoning. In a part of her opinion that was joined by Judge Tatel, Judge Rao explained that, "[w]hen confronted with a UCMJ provision allowing court-martial jurisdiction over a class of persons, the Supreme Court has repeatedly declined to defer to Congress." 45 F.4th at 87. That emphatic rejection of the

government's main argument here (and CAAF's main argument in *Begani*) underscores the stakes of expanding court-martial jurisdiction.

Instead, Judge Rao (joined on this point by Judge Walker) misinterpreted the limits the Supreme Court has required for courts-martial ever since *Toth*, cobbling together a new historical justification for such jurisdiction—one that neither party had briefed or argued in the district court or on appeal. Because that analysis would massively expand the permissible scope of military jurisdiction; because it is materially inconsistent with the Supreme Court's relevant decisions; and because, in any event, the majority's historical evidence does not actually support the conclusions for which it was cited, rehearing en banc should be granted.

## I. THE PANEL'S RULING WOULD HAVE STUNNING IMPLICATIONS FOR THE FUTURE OF MILITARY JURISDICTION

As Judge Tatel explained, "[t]he implications of this case stretch far beyond Larrabee and the Fleet Marine Corps Reserve. Millions of military retirees are also subject to military recall." *Id*. at 103 (Tatel, J., concurring in part and dissenting in part). Indeed, although the Fleet Marine Corps Reserve itself includes roughly 16,000 members, *see id*. at 83 n.1 (majority opinion), the authorities governing recall of retired

servicemembers to active duty encompass all 2.2 million retirees. *See, e.g.*, 10 U.S.C. § 688(a). Neither the government nor the panel majority has suggested otherwise.

That specter would be serious enough to warrant en banc review on its own. *See Toth*, 350 U.S. at 19 ("These figures point up what would be the enormous scope of a holding that Congress could subject every ex-serviceman and woman in the land to trial by court-martial . . . ."). But the panel's holding has even more far-reaching consequences.

Under the panel's reasoning, Congress could constitutionally subject every reservist to court-martial for offenses committed while they are inactive; and it could subject Selective Service registrants to court-martial for offenses committed while registered, even if they are never called to active duty, solely because they remain subject to such a call.[4]

---

4. The majority tried to distinguish Selective Service registrants, asserting that, "[o]nly after being ordered into service does a draftee become part of 'the land and naval Forces' whose members may be court-martialed." 45 F.4th at 99. But this *ipse dixit* is inconsistent with the rest of the panel's analysis. Just as retirees are bound to answer a recall order, *see* 10 U.S.C. § 688, Selective Service registrants are bound to obey an induction order—and can be court-martialed for refusing to do so. *Billings* v. *Truesdell*, 321 U.S. 542 (1944). Retirees and Selective Service registrants are distinguished not by their *current* military status, but by

The Supreme Court has regularly intervened to limit court-martial jurisdiction over personnel with *some* relationship to the armed forces. *See* Section II, *infra*. And it has consistently *justified* court-martial authority based on the need for good order and discipline only among troops *in active service. See, e.g.*, *Toth*, 350 U.S. at 22–23; *see also Burns* v. *Wilson*, 346 U.S. 137, 140 (1953) (plurality opinion) ("[T]he rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment."). But the Supreme Court has never resolved whether—and under what circumstances—inactive personnel can be court-martialed for offenses committed while they are inactive. The constitutional (and practical) stakes of answering that question are, as Judge Tatel made clear, enormous.

## II. THE PANEL'S JUSTIFICATION FOR EXPANSIVE COURT-MARTIAL JURISDICTION CONFLICTS WITH THE RELEVANT DECISIONS OF THE SUPREME COURT

---

the former's *prior* active service. But *Toth* forecloses relying upon prior active service as a basis for exercising court-martial jurisdiction.

The Supreme Court has repeatedly stressed the importance of narrowly circumscribing court-martial jurisdiction to focus on regulation of the "tightly knit military community." *Parker*, 417 U.S. at 749. To that end, the Court has struck down court-martial jurisdiction over military dependents, *Kinsella* v. *United States ex rel. Singleton*, 361 U.S. 234 (1960); *Reid* v. *Covert*, 354 U.S. 1 (1957); military contractors and employees, *McElroy* v. *United States ex rel. Guagliardo*, 361 U.S. 281 (1960); and even former servicemembers once they have been discharged from active service for offenses committed while they were on active duty, *Toth*, 350 U.S. 11. As CAAF put it a decade ago, these decisions reflect the Supreme Court's "repeated caution against the application of military jurisdiction over anyone *other than* forces serving in active duty." *United States* v. *Ali*, 71 M.J. 256, 269 (C.A.A.F. 2012) (emphasis added).[5]

The panel majority did not dispute this principle or its application to those contexts, but it wrongly brushed it aside here. In those prior

---

5. In addition to the substantive holdings that *Toth* and these later cases eventually announced, the Supreme Court regularly granted certiorari in them even in the absence of a circuit split—recognizing the underlying importance of deciding the constitutional scope of military jurisdiction over those not on active duty. *See, e.g.*, 350 U.S. at 13.

cases, it explained, "the accused had no formal relationship with the military and no ongoing obligation to obey military orders." 45 F.4th at 90. This statement is incorrect. Military contractors and employees unquestionably had (and have) formal relationships with the armed forces and an obligation to obey the orders and directives of their military employers. The only constitutional question was whether disobedience of those orders could make them liable to *military* prosecution in addition to the usual civil penalties attendant to a formal employment relationship. The Supreme Court—repeatedly—said no.

Beyond the factual error, the panel erred as a legal matter in concluding that military retirees—who may one day be summoned to active duty—are *presently* in "the land and naval Forces," as the Constitution requires. The Supreme Court has been clear since *Toth* that its concern about the potential breadth of court-martial jurisdiction extends *beyond* civilians—to encompass all those who are "not in active service." *See Toth*, 350 U.S. at 22. The panel majority did not dispute that retirees are "not in active service"; it just did not think that *Toth*'s principle applied because retirees *might* one day be recalled to active

10

duty. Even if recall were more than a theoretical specter,[6] however, that analysis misses the point of the *Toth* line of cases—which focus on the accused's *current* military status, not his potential future (or past) status.

The Supreme Court's repeated admonitions about narrowly construing military jurisdiction necessarily apply to *any* individuals who are not in active service—a conclusion that puts the burden on the government to provide some affirmative justification for how courts-martial in such cases advance military discipline. *See Toth*, 350 U.S. at 22. As Judge Tatel detailed, neither the government nor the majority advanced such an argument here. 45 F.4th at 102–03 (Tatel, J., concurring in part and dissenting in part). Nor could they.[7]

---

6. In fact, a vanishingly small number of retired servicemembers are—or can ever be—involuntarily recalled to active duty. The government's own mobilization criteria categorically exclude more than two-thirds of military retirees from recall (due to age or disability). *See Larrabee* v. *Braithwaite*, 502 F. Supp. 3d 322, 332 (D.D.C. 2020) (citing DoD Instruction 1352.01, ¶ 3.2(g)(2) (2016)). And when ordered by the Navy-Marine Corps Court of Criminal Appeals in *Begani* to produce *any* data on the number of retirees involuntarily recalled in recent years, the government was unable to do so. *See* Plaintiff-Appellee Br. 32 n.15.

7. In *Toth* and its progeny, the Supreme Court rejected the argument that the *unavailability* of a civilian forum could establish the necessity of a court-martial. *See, e.g.*, 350 U.S. at 20–21. But even if the absence of a civilian forum could ever be probative, it is not at issue here. Had he not been subject to court-martial, Mr. Larrabee could have been tried in

11

The panel's holding also has no limiting principle. Because it does not follow *Toth*'s "narrowest jurisdiction possible" standard, it clears the way for Congress to authorize the court-martial of *any* individual with some relationship to the military who is legally obliged to answer a military activation order if and when it comes.

In defense of that view, the majority claimed that "[w]e fail to see why a servicemember who must obey one order is less a part of 'the land and naval Forces' than his peer who must obey two." 45 F.4th at 98. But the answer, as Judge Tatel explained, is that those who must obey only one order—*i.e.,* an order to join active service—have no military duties or responsibilities *until* that first order is given. *Id.* at 102–03 (Tatel, J., concurring in part and dissenting in part).

The panel suggested otherwise, pointing to the fact that retirees could be required to undergo training and the requirement that they keep the government apprised of their current mailing address. *Id.* at 84 (majority opinion). But retirees must be *recalled to active duty* before they can be ordered to undergo training. *See* 10 U.S.C. § 8385(b) ("In time of

---

civilian court under the Military Extraterritorial Jurisdiction Act of 2000, 18 U.S.C. §§ 3261–67. The government has not argued otherwise.

peace any member of . . . the Fleet Marine Corps Reserve may be required to perform not more than two months' *active duty* for training in each four-year period." (emphasis added)).

In other words, the panel was simply wrong that training is an obligation retirees hold *as* retirees. *See also* 45 F.4th at 103 (Tatel, J., concurring in part and dissenting in part) (noting that *only* retirees are exempt from the military's COVID vaccination requirement). As for the "duty" to keep the government apprised of a current address, comparable "duties" are shared by many civilians—including Selective Service registrants. *See* 32 C.F.R. § 1621.1(a) (2020).

Ultimately, the majority's linchpin was the notion that "[i]n times of emergency and war, Fleet Marine Reservists must answer the call to serve, whereas civilians may choose to stay home." 45 F.4th at 95 n.13. But that claim is both untrue (again, the Selective Service proves the point) and irrelevant. No one disputes that retired servicemembers must answer a recall order in the rare event that one is given. The question is whether they can constitutionally be subject to court-martial *until* that happens. And because neither the government nor the majority offered any argument, let alone any proof, that court-martial jurisdiction while

inactive is *necessary* to ensure readiness for future recall (a very difficult

argument to make given that reservists are *not* currently subject to court-

martial while inactive), the Supreme Court's guiding principles in the

*Toth* line of cases foreclose the majority's conclusion.[8]

### III.  THE PANEL'S SUPERFICIAL HISTORICAL ANALYSIS DOES NOT SUPPORT ITS HOLDING

The panel claimed to find support for its reading of the *Toth* line of

cases in its "understanding of the original meaning of the Make Rules

Clause." *Id*. at 91. For that historical claim, which neither party had

briefed or argued, the majority conducted its own assessment of

Founding-era British and American military practice, seizing on two

examples: "half-pay officers" under British practice; and "furloughed"

soldiers under American practice.

With regard to half-pay officers, the majority found it probative that

Parliament in 1749 had briefly authorized courts-martial of such

---

8. The panel claimed to draw support from dicta in *United States* v. *Tyler*, 105 U.S. 244 (1882), and *Barker* v. *Kansas*, 503 U.S. 594 (1992). *See* 45 F.4th at 96–97. But neither case involved a court-martial, let alone a constitutional challenge to court-martial jurisdiction. *Tyler* merely summarized what the Articles of War then provided, and *Barker* simply quoted *Tyler*'s dicta. The military courts have correctly accepted that the question presented must be resolved based on "first principles." *United States* v. *Dinger*, 76 M.J. 552, 556 (N-M. Ct. Crim. App. 2017).

individuals when *not* in active service—even though, as the panel acknowledged, popular objections forced Parliament to abandon the practice in 1751. 45 F.4th at 92–93. In the majority's view, the key was that "Parliament had subjected half-pay officers to court-martial jurisdiction earlier in the eighteenth century, and that its *authority* to do so was not disputed." *Id.* at 93 n.8.

But the absence of a "dispute" over Parliament's authority proves nothing. Parliament had—and continues to have—plenary authority to enact *any* law. Congress, by contrast, is bound by the Constitution, which deliberately rejected the parliamentary model. And the majority's reflections on the "transcendent and absolute" powers of Parliament, *see* 1 Blackstone, *Commentaries* *156, move the goalposts. If the claim is that the Constitution reflects British *practice*, then any historical analysis should necessarily privilege what that practice *was* as of the mid-1780s over what it could have been.

Instead, if the Founders incorporated existing British practice (as opposed to the limits of what British law, operating under a very different constitution, would have allowed), then by the time our Constitution was written, half-pay British officers had not been subject to court-martial for

nearly two generations—as the panel all but conceded. 45 F.4th at 93 n.8. Not only that, but the contemporaneous American "practice," reflected in the Articles of War in effect at the time the Constitution was ratified, reflected Parliament's *repudiation* of that authority. *See id.*

The panel also relied on examples of furloughed Continental Army soldiers being tried by court-martial during the Revolutionary War. But furlough was, by definition, a temporary leave of absence from a specific geographic location, not a permanent change in service status. Indeed, now-defunct statutes expressly exempted retirees from furlough—since, unlike active-duty personnel, they were categorically inactive. *See, e.g.*, 10 U.S.C. § 6406(a) (repealed 1970) ("The Secretary of the Navy may furlough any officer of the Regular Navy or the Regular Marine Corps, other than a retired officer.").

The panel's excursion into historical materials never cited by the government or explored through the adversary process is at odds with "the principle of party presentation," which the Supreme Court recently reaffirmed in the specific context of Founding-era historical claims. *See N.Y. State Rifle & Pistol Ass'n* v. *Bruen*, 142 S. Ct. 2111, 2130 n.6 (2022) (citing *United States* v. *Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)).

And the panel's erroneous historical conclusions underscores the need for the adversary process in this context. *See id*. ("Courts are thus entitled to decide a case based on the historical record compiled by the parties.").

Even if historical claims like the panel majority's could *ever* justify distinguishing the principles articulated by the Supreme Court in *Toth* and subsequent cases, rehearing en banc would still be warranted to allow for proper party presentation of the Founding-era practices on which the panel purported to rely—presentation that would only reinforce the errors in the majority's conclusions.

"[H]aving experienced the military excesses of the Crown in colonial America, the Framers harbored a deep distrust of executive military power and military tribunals." *Loving* v. *United States*, 517 U.S. 748, 760 (1996); *see Lee* v. *Madigan*, 358 U.S. 228, 232 (1958) ("The attitude of a free society toward the jurisdiction of military tribunals . . . has a long history."). This distrust of expansive military jurisdiction is well-founded not only for procedural reasons, but because of the type of conduct the military can regulate: Courts-martial have the power to prosecute substantive offenses that the Constitution would not abide in civilian courts. *See, e.g.*, *Parker*, 417 U.S. at 735. And they employ procedures

forbidden in every other American criminal forum. *Compare* 10 U.S.C. § 852(a)(3) (authorizing convictions in noncapital courts-martial by three-fourths of the members), *with Ramos* v. *Louisiana*, 140 S. Ct. 1390 (2020) (incorporating the right to unanimous jury verdicts against the states). Despite these departures, courts-martial are authorized to impose criminal sentences up to and including death—even for offenses for which the death penalty is constitutionally unavailable in civilian courts. *Cf. United States* v. *Briggs*, 141 S. Ct. 467 (2020) (holding that rape is an offense "punishable by death" for purposes of the military statute of limitations).

Military necessity justifies these extraordinary departures from our usual constitutional order where active-duty personnel are involved. But just "[a]s necessity creates the rule, so it limits its duration." *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 127 (1866); *see also Larrabee*, 502 F. Supp. 3d at 327 ("Experience has clearly demonstrated the baseline proposition that court-martial jurisdiction must be narrowly limited."). As the Supreme Court put it in *Toth*, "[c]ourt-martial jurisdiction sprang from the belief that within the military ranks there is need for a prompt, ready-at-hand means of compelling obedience and order. But Army

discipline will not be improved by court-martialing rather than trying by jury some civilian ex-soldier who has been wholly separated from the service for months, years or perhaps decades." 350 U.S. at 22. Nor here.

Given both the systematic inapplicability of the UCMJ to other inactive personnel and the lack of duties and authorities possessed by members of the Fleet Reserve, the government cannot carry its burden to show why military retirees need to be subject to the UCMJ while they are retired. And so long as military jurisdiction in this country is to remain the exception, and the requirements of Article III and the Bill of Rights the norm, compelling prudential, historical, and constitutional reasons explain why they should not be—and why the full court should reconsider the divided panel's holding to the contrary.

## CONCLUSION

For the foregoing reasons, the petition for rehearing en banc should be granted.

Respectfully submitted,

**Stephen I. Vladeck**
*Counsel of Record*
727 East Dean Keeton St.
Austin, TX  78705
(512) 475-9198
svladeck@law.utexas.edu

**Michael R. Dreeben**
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC  20006

**Eugene R. Fidell**
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, N.W., 4th Floor
Washington, DC  20036

October 17, 2022

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure Rule 32(a)(7)(B),

I hereby certify that this brief contains 3,893 words, as calculated by

the word count function in Microsoft Word, and excluding the items

that may be excluded under Federal Rule of Appellate Procedure

32(a)(7)(B)(iii).  This brief uses a proportionally spaced typeface,

Century Schoolbook, with 14-point typeface, in compliance with Federal

Rules of Appellate Procedure 32(a)(5)(A) and 32(a)(6).

Stephen I. Vladeck
Counsel for Petitioner

October 17, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of October, 2022, a true and correct copy of the foregoing Petition for Rehearing En Banc was filed electronically with the Court and served on all counsel of record in this appeal via CM/ECF.

Stephen I. Vladeck
Counsel for Petitioner

October 17, 2022

# ADDENDUM

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 22, 2021               Decided August 2, 2022

No. 21-5012

STEVEN M. LARRABEE,
APPELLEE

v.

CARLOS DEL TORO, IN HIS OFFICIAL CAPACITY AS SECRETARY
OF THE NAVY, AND UNITED STATES,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-00654)

———

*Cynthia A. Barmore*, Attorney, U.S. Department of Justice, argued the cause for appellants. With her on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, and *Sharon Swingle*, Attorney.

*Stephen I. Vladeck* argued the cause for appellee. With him on the brief was *Eugene R. Fidell*.

*A. Richard Ellis* was on the brief for *amicus curiae* National Institute of Military Justice in support of appellee.

*Joshua E. Kastenberg* and *J. Wesley Moore*, pro se, were on the brief for *amici curiae* in support of appellee.

2

Before: TATEL,* RAO, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.⁺

Opinion concurring in part and dissenting in part filed by *Circuit Judge* TATEL.

RAO, *Circuit Judge*: Steven Larrabee, a member of the Fleet Marine Corps Reserve, pleaded guilty at a court-martial to the sexual assault of a civilian. In this collateral challenge to his sentence, Larrabee argues that the statutory grant of military jurisdiction over Fleet Marine Reservists exceeds Congress' authority to "make Rules for the Government and Regulation of the land and naval Forces," U.S. CONST. art. I, § 8, cl. 14 ("Make Rules Clause"), and that his "case[]" did not "aris[e] in the land and naval forces," *id.* amend. V ("Grand Jury Clause"). The district court held for Larrabee. We now reverse.

Whether a person may be subjected to court-martial jurisdiction turns "on one factor: the military status of the accused." *Solorio v. United States*, 483 U.S. 435, 439 (1987). Based on the Supreme Court's precedents interpreting the Make Rules Clause as well as the original meaning of that Clause, we hold that a person has "military status" if he has a formal relationship with the military that includes a duty to obey military orders. As a Fleet Marine Reservist, Larrabee was "actually [a] member[] or part of the armed forces," and therefore amenable to military jurisdiction under the Make Rules Clause. *United States ex rel. Toth v. Quarles*, 350 U.S.

---

* *Circuit Judge* TATEL assumed senior status after this case was argued and before the date of this opinion.

⁺ *Circuit Judge* WALKER joins the majority opinion as to all except Part III.

3

11, 15 (1955). We also hold that the Fifth Amendment's Grand Jury Clause did not separately bar Larrabee's court-martial.

I.

A.

The Fleet Marine Corps Reserve is one part of the Marine Corps, alongside the Regular Marine Corps and the Marine Corps Reserve.[1] 10 U.S.C. § 8001(a)(2). Its name notwithstanding, the Fleet Marine Reserve is not a "reserve component" of the armed forces. *See id.* § 10101 (listing the military's reserve components). Marine Corps reservists are part-time soldiers who maintain civilian jobs but who are trained like full-time troops and who may be ordered into active-duty service, if necessary. *Id.* §§ 10102, 12301(a)–(b). Membership in the Fleet Marine Reserve, by contrast, is a de facto retirement status for those who have previously served in active duty. *See United States v. Begani*, 81 M.J. 273, 275 (C.A.A.F. 2021) (recognizing that after a Marine's transfer to the Fleet Marine Reserve, "for all intents and purposes, he [has] retired") (cleaned up). A Marine becomes eligible to transfer into the Fleet Marine Reserve after serving in active duty for at least twenty years. 10 U.S.C. § 8330(b). After thirty total years of service, he is then formally retired.[2] *Id.* § 8331(a); *see also id.* § 8326(a). At any time after completing his required years of service—whether he is in active duty, a Fleet Marine

---

[1] The Fleet Marine Reserve was 15,600 strong at the time of oral argument.

[2] By statute, Fleet Marine Reservists and formally retired Marines have similar rights and responsibilities. They are entitled to the same amount of pay, *see* 10 U.S.C. §§ 8326(c)(2), 8330(c)(1), and are both subject to ongoing service duties, *see id.* § 688(a)–(c). In this opinion, we use the term "military retiree" in its formal sense, to refer to persons on Marine Corps' retired lists.

4

Reservist, or a retiree—a Marine may request to be discharged, which results in a "[c]omplete severance from all military status." MARINE CORPS ORDER 1900.16, SEPARATION AND RETIREMENT MANUAL ¶ 1002.20 (2019) [hereinafter MCO 1900.16].

During the window between active duty and formal retirement, members of the Fleet Marine Reserve receive "retainer pay," calculated based on their rank and years of service at the time of transfer. 10 U.S.C. §§ 8330(c)(1), 8333. They are also subject to ongoing military duties. In times of war or national emergency or "when otherwise authorized by law," Fleet Marine Reservists "may be ordered … to active duty without [their] consent" for the duration of the crisis, and up to six months thereafter. *Id.* § 8385(a). In peacetime, they agree to serve for up to twelve months in any two-year period, *see id.* § 688(a), (b)(3), (e)(1), and may be ordered into "active duty for training" for up to two months in any four-year period, *id.* § 8385(b). Finally, they must comply with administrative reporting requirements—they must inform the military if they change addresses, for instance—and are subject to restrictions on foreign employment.

Under the Uniform Code of Military Justice ("UCMJ"), Fleet Marine Reservists may be court-martialed. *Id.* § 802(a)(6). Congress has given the military courts jurisdiction over the Fleet Marine Reserve since 1925. *See* Act of Feb. 28, 1925, §§ 2, 10, Pub. L. No. 68-512, 43 Stat. 1080, 1080–81, 1083.

B.

The facts in this case are undisputed. After twenty years in active-duty service, Larrabee transferred to the Fleet Marine Reserve. He began working as a civilian employee on his former base in Iwakuni, Japan, and moonlighting as a manager

5

at two local bars near the base. After a late night of drinking, Larrabee sexually assaulted an inebriated and unconscious bartender and filmed the encounter on his cell phone. His victim, the wife of an active-duty Marine, reported the assault to Military Police, who obtained the video from Larrabee's phone. The victim's husband was immediately reassigned to a posting in the United States. Larrabee was charged with "sexual assault" and "indecent recording" under the UCMJ. *See* 10 U.S.C. §§ 920(b), 920c(a)(2). He pleaded guilty at a court-martial and was sentenced to ten months' confinement and a dishonorable discharge.

Larrabee appealed to the Navy-Marine Corps Court of Criminal Appeals ("CCA"), arguing, as relevant here, that the UCMJ provision authorizing court-martial jurisdiction over members of the Fleet Marine Reserve, 10 U.S.C. § 802(a)(6), was unconstitutional. Military retirees, he argued, are not part of "the land and naval Forces" that Congress may place under the jurisdiction of courts-martial. U.S. CONST. art. I, § 8, cl. 14. The CCA had recently held that personnel "in a retired status remain members of the land and Naval forces who may face court-martial," *United States v. Dinger*, 76 M.J. 552, 557 (N-M. Ct. Crim. App. 2017) (cleaned up), so it "summarily reject[ed]" Larrabee's challenge as well, *United States v. Larrabee*, 2017 WL 5712245, at *1 n.1 (N-M. Ct. Crim. App. Nov. 28, 2017). The Court of Appeals for the Armed Forces ("CAAF") summarily upheld his conviction without reaching the constitutional question at issue here. *United States v. Larrabee*, 78 M.J. 107 (C.A.A.F. 2018) (mem.), *cert. denied*, 139 S. Ct. 1164 (2019).

His direct appeals exhausted, Larrabee brought this collateral challenge to his sentence in the District Court for the District of Columbia. He argued that Section 802(a)(6) is facially unconstitutional because a Fleet Marine Reservist is

6

"for all practical purposes a civilian" and therefore not subject to regulation under the Make Rules Clause. *See* U.S. CONST. art. I, § 8, cl. 14. In the alternative, even if the Fleet Marine Reserve is part of the "land and naval Forces," Larrabee insisted his court-martialing was still unconstitutional under the Fifth Amendment's Grand Jury Clause because his "case[]" did not "aris[e] in the land or naval forces." *Id.* amend. V (requiring grand jury indictments for all "capital[] or otherwise infamous" crimes, "except in cases arising in the land or naval forces, or in the Militia"). Under the Grand Jury Clause, Larrabee argued, the military may not court-martial a retiree for an offense that bears "no connection to the armed forces." Since he was accused of committing civilian crimes against a civilian on private property, the court-martial's exercise of jurisdiction in his case was unconstitutional.

After both parties moved for judgment on the pleadings, the district court held for Larrabee. *See Larrabee v. Braithwaite*, 502 F. Supp. 3d 322, 333 (D.D.C. 2020). The central question, the court explained, was "one of status, namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces.'" *Id.* at 328 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 241 (1960)). Fleet Marine Reservists were part of the "land and naval Forces," the court reasoned, only if subjecting them to court-martial jurisdiction was "necessary to maintain good order and discipline" within the military's ranks. *Id.* at 331. Because "trial by military court-martial 'was intended to be only a narrow exception to the normal and preferred method of trial in courts of law,'" the court held the government bore the burden of showing why subjecting persons in the Fleet Marine Reserve to court-martial jurisdiction was necessary. *Id.* at 327 (quoting *Reid v. Covert*, 354 U.S. 1, 21 (1957) (plurality opinion)).

7

The government offered two reasons why subjecting Fleet Marine Reservists to court-martial jurisdiction was necessary to preserve military order and discipline, but the district court was persuaded by neither. First, the government argued that because they may be ordered into active duty "without [their] consent," 10 U.S.C. § 8385(a), Fleet Marine Reservists remain a part of the nation's fighting forces. Subjecting them to court-martial jurisdiction was therefore essential to uphold order in the military's ranks. As the district court pointed out, however, under current military regulations "retirees are highly unlikely to be recalled." *Larrabee*, 502 F. Supp. 3d at 331. Congress has extended court-martial jurisdiction over Marine Corps reservists only in narrow circumstances but has subjected members of the Fleet Marine Reserve to court-martial at all times. That discrepant treatment was fatal to any military necessity argument, in the court's view.

Second, the government argued that Fleet Marine Reservists' "retainer pay represents reduced compensation for [their] current part-time services," but the court found this inaccurate because "military retirement benefits actually represent *deferred* pay for past services," and irrelevant because the receipt of a military pension was not, standing alone, sufficient to place a person in the "land and naval Forces." *Id.* at 330. Soldiers' dependents are entitled to military benefits, and military contractors are often paid by the military, but neither class of persons may be court-martialed. *Id.* at 330–31 (citing *Covert*, 354 U.S. at 23, and *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281, 286 (1960), respectively). Finding none of the government's arguments persuasive, the court held Section 802(a)(6) facially unconstitutional and did not reach Larrabee's as-applied challenge. The government timely appealed.

8

II.

Our review of the district court's judgment on the pleadings is de novo. *Jones v. Dufek*, 830 F.3d 523, 525 (D.C. Cir. 2016). The authority of a federal court to collaterally review a jurisdictional challenge to a conviction by court-martial is long established. *See In re Grimley*, 137 U.S. 147, 150 (1890) ("It cannot be doubted that the civil courts may in any case inquire into the jurisdiction of a court-martial, and if it appears that the party condemned was not amenable to its jurisdiction, may discharge him from the sentence."). That authority persists even where the court-martial's sentence was not custodial, or if the plaintiff is no longer in military custody. *See Sanford v. United States*, 586 F.3d 28, 32 (D.C. Cir. 2009) ("[F]ederal courts have jurisdiction to review the validity of court-martial proceedings brought by non-custodial plaintiffs.") (cleaned up); *Schlesinger v. Councilman*, 420 U.S. 738, 749–53 (1975) (reading the UCMJ and 28 U.S.C. § 1331 to permit non-habeas collateral attacks against court-martial judgments that are allegedly "void").

Faced with a constitutional challenge to a military court's sentence, we must assess whether the military courts properly exercised jurisdiction in Larrabee's case. *See Grisham v. Hagan*, 361 U.S. 278, 279–80 (1960) (giving no deference to a court-martial's finding that it had jurisdiction over the accused); *Guagliardo*, 361 U.S. at 282–84 (same); *Singleton*, 361 U.S. at 235–36 (same); *Covert*, 354 U.S. at 3–5 (same). "[W]hether the Constitution requires Article III courts to try [certain] offenses," or whether they may be tried in a different forum, "is a structural question of subject matter jurisdiction" subject to "de novo review" in this court. *Al Bahlul v. United States*, 840 F.3d 757, 760 n.1 (D.C. Cir. 2016) (en banc) (Kavanaugh, J., concurring). Our jurisdiction cannot be circumscribed by the decisions of Article I courts, because the

9

Constitution's structure of separated powers requires the Article III courts to exercise "judicial Power" independently of the other departments. U.S. CONST. art. III; *cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803). We therefore proceed to consider whether the exercise of court-martial jurisdiction over Larrabee was constitutional.

III.

At the outset, we address the government's argument that this court must defer to Congress in determining whether Fleet Marine Reservists are properly subject to court-martial jurisdiction under the Make Rules Clause.[3] Because "any expansion of court-martial jurisdiction … necessarily encroaches on the jurisdiction of federal courts set up under Article III of the Constitution," *Toth*, 350 U.S. at 15, we cannot simply defer to Congress' decision to extend court-martial jurisdiction over Fleet Marine Reservists. Such extension is constitutional only if Fleet Marine Reservists "can be regarded as falling within the term 'land and naval Forces,'" *Singleton*, 361 U.S. at 241—a question that turns on "the military status of the accused," *Solorio*, 483 U.S. at 439.

When confronted with a UCMJ provision allowing court-martial jurisdiction over a class of persons, the Supreme Court has repeatedly declined to defer to Congress. *See, e.g.,*

---

[3] The government has argued that Larrabee was properly subject to court-martial jurisdiction because Section 802(a)(6) is consistent with the Make Rules Clause. This case therefore does not implicate the jurisdiction of courts-martial in theaters of war. In that distinct context, given "the extraordinary circumstances present in an area of actual fighting," courts-martial may try both civilians and military personnel. *Covert*, 354 U.S. at 33. That power stems not from Congress' authority under the Make Rules Clause, but "must rest on the Government's 'war powers.'" *Id.*

10

*Guagliardo*, 361 U.S. at 283–87 (giving no deference to Congress' determination that civilian military contractors may be court-martialed); *Covert*, 354 U.S. at 19–23 (same, for servicemembers' dependents); *Toth*, 350 U.S. at 19–23 (same, for former servicemembers). Instead the Court has asked whether the accused was "actually [a] member[] or part of the armed forces," or else was a "civilian[] … entitled to have the benefit of safeguards afforded those tried in the regular courts authorized by Article III." *Toth*, 350 U.S. at 15, 23. Although Congress maintains "plenary" authority under the Make Rules Clause to determine which offenses may be punished by court-martial, *Solorio*, 483 U.S. at 441, it does not possess the anterior authority to define which persons may be constitutionally court-martialed.

The government argues that this case is unique because Congress has not only authorized the court-martialing of Fleet Marine Reservists under the Make Rules Clause but has also defined the Fleet Marine Reserve as part of the "armed forces" pursuant to its authority under the Army and Navy Clauses. 10 U.S.C. §§ 101(a)(4), 8001(a)(2); U.S. CONST. art. I, § 8, cls. 12–13 ("Army and Navy Clauses") (authorizing Congress to "raise and support Armies" and "provide and maintain a Navy"). Without question, Congress' power to raise and support the nation's fighting forces is capacious and entitled to substantial deference. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968) ("The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping."). It follows, the government argues, that if Congress raises a military force pursuant to the Army and Navy Clauses, individuals in that force are *ipso facto* in "the land and naval Forces" covered by the Make Rules Clause.

11

The Supreme Court has recognized, however, that these Clauses are not coextensive, noting that "there might be circumstances where a person could be 'in' the armed services for purposes of [the Make Rules Clause] even though he had not formally been inducted into the military." *Covert*, 354 U.S. at 23; *see also Guagliardo*, 361 U.S. at 284–85 (citing *Ex parte Reed*, 100 U.S. 13 (1879)). Because these Clauses are not perfectly overlapping, it is not necessarily the case that if a person is part of the forces Congress has raised under the Army and Navy Clauses, he may be court-martialed under the Make Rules Clause. The fact that Congress has chosen to define the Fleet Marine Reserve as part of the armed forces is therefore not sufficient to make its members constitutionally amenable to court-martial.

The Supreme Court has not deferred to Congress' judgments in this area, but instead has assessed whether a person was *actually in* the armed forces, or instead was a civilian. In *Guagliardo*, the Court indicated that if Congress wanted to subject military contractors to court-martial jurisdiction, it could draft them into the armed forces. *See* 361 U.S. at 286. For Congress to invoke its power under the Army and Navy Clauses and *label* them part of the "land and naval Forces" would not have been enough. Similarly, in *Toth*, the Court held that Congress could not extend court-martial jurisdiction over a former serviceman who had been discharged from the army and returned to civilian life. *See* 350 U.S. at 22– 23. Nothing in *Toth* or its successor cases suggests that if Congress had just defined the accused civilian as a member of the "land and naval Forces," the Court would have reached a different result. Congress may not, through an act of legislative bootstrapping, expand the scope of the Make Rules Clause by defining (or redefining) its terms.

12

Contrary to the government's assertions, Congress cannot rely on the Necessary and Proper Clause "to extend military jurisdiction to any group of persons beyond that class described" in the Make Rules Clause. *Covert*, 354 U.S. at 20–21; *see also Toth*, 350 U.S. at 22 (explaining that the Make Rules Clause does not "deprive people of trials under Bill of Rights safeguards, and we are not willing to hold that power to circumvent those safeguards should be inferred through the Necessary and Proper Clause"). As the Court has recognized, "a statute cannot be framed by which a civilian can lawfully be made amenable to the military jurisdiction in time of peace." *Covert*, 354 U.S. at 35 (quoting WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 107 (2d ed. 1920) (1886)) (cleaned up).

Congress' authority under the Make Rules Clause is circumscribed by Article III and the Grand Jury Clause, which protect individual liberty interests. *See id.* at 21 ("Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections."). Because of the constitutional interests at stake, we do not defer to Congress' judgments about the classes of persons who are within the "land and naval Forces," and thus subject to court-martial jurisdiction.

## IV.

Whether Larrabee was constitutionally subjected to court-martial jurisdiction turns "on one factor: the military status of the accused." *Solorio*, 483 U.S. at 439. Neither the Supreme Court nor this court has spoken directly to the constitutional question of whether Fleet Marine Reservists specifically, or inactive-duty military retirees more generally, may be court-martialed. The Court's decisions interpreting the Make Rules

13

Clause, however, draw a consistent distinction between civilians on the one hand and persons in the armed forces on the other. "[I]f the language of [the Make Rules Clause] is given its natural meaning, the power granted does not extend to civilians[.] … The term 'land and naval Forces' refers to persons who are members of the armed services and not to [civilians]." *Covert*, 354 U.S. at 19–20 (cleaned up).

In each case in which the Court has found that the accused was in "the land and naval Forces," he had a formal "relationship with the military and its institutions," which made him "actually [a] member[] or part of the armed forces." *Toth*, 350 U.S. at 14–15. Soldiers in active-duty service, most typically, may be subject to court-martial jurisdiction. *Cf. Dynes v. Hoover*, 61 U.S. (20 How.) 65, 79 (1857). Such active-duty personnel have been inducted into the military, are in the chain of command, and are required to obey their superiors' orders. But the Court has also held that, in certain narrow circumstances, the Constitution permits the court-martialing of persons not presently in active-duty service—so long as they have a particular kind of "relationship with the military and its institutions." *Toth*, 350 U.S. at 14.

The Court's Make Rules Clause jurisprudence has been shaped in response to a diverse range of cases in which a person was court-martialed. What unites the decisions in these different contexts is that the persons found to be properly within "the land and naval Forces" had a formal relationship with the military that included an obligation to obey military orders.

In *Reed*, for instance, the Court held that a Navy paymaster's clerk was amenable to court-martial. 100 U.S. at 22. The clerk had never been formally inducted into the Navy and so was not an active-duty servicemember. Nevertheless,

14

the clerk had agreed to serve on a naval vessel, binding "himself to be subject to the laws and regulations for the government of the navy and the discipline of the vessel," and had "take[n] an oath … to serve until discharged." *Id.* at 19–20, 22 (cleaned up). The clerk's formal relationship with the Navy was further confirmed by the fact that he was appointed by the commander of the ship and could only be discharged in the same way. He wore a uniform, had a fixed rank, and was on the Navy's payroll. *Id.* at 22. Finally, at the time of his court-martialing, the clerk had not been discharged and so had an ongoing obligation to obey the orders of the vessel's commander. *Id.* at 20. In light of these observations, the Court concluded, "[i]f these officers are not in the naval service, it may well be asked who are." *Id.* at 22.

Similarly, in *Kahn v. Anderson*, the Court held that a group of soldiers who had been court-martialed and sentenced to a term of imprisonment remained amenable to court-martial for crimes committed while in military custody. *See* 255 U.S. 1, 7–8 (1921). The prisoners had argued that, as a result of their initial conviction, they had "ceased to be soldiers and were no longer subject to military law." *Id.* at 7. Rejecting that argument as "unsubstantial," the Court held that "even if their discharge as soldiers had resulted from the previous sentences … it would be here immaterial, since, as they remained military prisoners, they were for that reason subject to military law and trial by court-martial for offenses committed during such imprisonment." *Id.* at 7–8 (citing *Carter v. McClaughry*, 183 U.S. 365, 383 (1902)). The prisoners had a legal relationship with the armed forces, even if involuntary, because they were "military prisoners undergoing punishment for previous sentences." *Id.* at 7. As the Court explained in *Carter*, because military jurisdiction "attache[s]" at the time of a soldier's court-martialing, he remains under the military's jurisdiction until his release. 183 U.S. at 383. "Having [been] sentenced,

15

his status [is] that of a military prisoner" who must obey military orders. *Id.* Therefore, "for offences committed during his confinement he [is] liable to trial and punishment by court martial." *Id.*

Congress also may authorize courts-martial to punish those who disobey lawful draft orders. *See Billings v. Truesdell*, 321 U.S. 542, 556 (1944) ("We have no doubt of the power of Congress to enlist the manpower of the nation for prosecution of the war and to subject to military jurisdiction those who are unwilling, as well as those who are eager, to come to the defense of their nation in its hour of peril.").[4] From the moment he is called to serve, a draftee becomes part of "the land and naval Forces"—bound to the military by a legal duty to serve, even if involuntarily. *Cf. Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 20 (1820) ("[I]f Congress had pleased so to declare, a militia man, called into the service of the United States, might have been held and considered as being constructively in that service, though not actually so."); *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 33–34 (1827) (permitting the court-martialing of a man who was ordered into militia service, but refused to join). Even if he refuses to be inducted, a draftee is a member of the armed forces and obliged to obey military orders. *Billings*, 321 U.S. at 556.

The clerk in *Reed*, the prisoner in *Kahn*, and the draftee in *Billings* each had a legal relationship to the military that included an ongoing duty to obey military orders. For that reason, they came within the scope of "the land and naval Forces."

---

[4] *Billings* ultimately held that the courts-martial lacked jurisdiction for statutory, not constitutional, reasons. *See* 321 U.S. at 556–58.

16

By contrast, in every case in which the Court has struck down the exercise of court-martial jurisdiction over a class of persons, the accused had no formal relationship with the military and no ongoing obligation to obey military orders. In *Toth*, for example, the Court made clear that servicemembers who have been legally discharged and returned to civilian life are not part of "the land and naval Forces." *See* 350 U.S. at 22–23. Although Toth was accused of committing a crime while a servicemember, at the time of his arrest he had been discharged and "had no relationship of any kind with the military." *Id.* at 13. Whatever his prior relation to the military, the Make Rules Clause did not permit a discharged soldier to be court-martialed. "For given its natural meaning, the power granted Congress 'To make Rules' to regulate 'the land and naval Forces' would seem to restrict court-martial jurisdiction to persons who are actually members or part of the armed forces"—that is, persons who are in the armed forces at the time of their court-martialing. *Id.* at 15. The Court explained that the purpose of the military justice system would not be impaired by "giving ex-servicemen the benefit of a civilian court trial when they are actually civilians." *Id.* at 22.

In a pair of successor cases, the Court extended *Toth*'s basic logic to hold that servicemembers' civilian dependents may not be court-martialed. "The term 'land and naval Forces' refers to persons who are members of the armed services and not to their civilian wives, children and other dependents." *Covert*, 354 U.S. at 19–20; *see also Singleton*, 361 U.S. at 248. As the Court explained, the servicemembers' dependents "had never been members of the army, had never been employed by the army, [and] had never served in the army in any capacity." *Covert*, 354 U.S. at 32. Although they often live with servicemembers on military installations and receive military benefits, they "do not lose their civilian status and their right to a civilian trial" by virtue of those facts. *Id.* at 23.

17

Similarly, the Court has held that private military contractors may not be court-martialed. Like discharged soldiers and servicemembers' dependents, the Constitution "requires [the military's] civilian employees to be afforded the same right of trial by jury." *Grisham*, 361 U.S. at 280. In *Guagliardo*, the Court noted that private contractors could be court-martialed if they had voluntarily bound themselves to the military through procedures like those used by the paymaster's clerk in *Reed*, or if they had been "incorporate[d] … directly into the armed services, either by compulsory induction or by voluntary enlistment." 361 U.S. at 286. But unless such action were taken to bring them into a "military status," private contractors remained "civilians" outside the scope of the Make Rules Clause. *Id.* at 287, 284.

The Court has declined to adopt a bright-line test to distinguish between civilians and those within the "land and naval Forces." *See Covert*, 354 U.S. at 22 ("Even if it were possible, we need not attempt here to precisely define the boundary between 'civilians' and members of the 'land and naval Forces.'"). Nonetheless, its decisions construing the scope of the Make Rules Clause, read together, suggest that a person is part of the "land and naval Forces" and may be subject to court-martial jurisdiction if he has a formal relationship with the armed forces that includes a duty to obey military orders.[5]

---

[5] A legal relationship to the military that includes an obligation to obey military orders is sufficient for membership in "the land and naval Forces." Therefore, we need not decide whether such a relationship is necessary for membership in "the land and naval Forces."

18

V.

The rule suggested by the Court's caselaw is consistent with our understanding of the original meaning of the Make Rules Clause. The American "court-martial is in fact older than the Constitution." *Ortiz v. United States*, 138 S. Ct. 2165, 2175 (2018) (cleaned up). The Court has therefore often "undertaken … the difficult task of interpreting [the Make Rules Clause] by drawing upon English constitutional history." *Loving v. United States*, 517 U.S. 748, 760 (1996). The organization and regulation of the eighteenth-century British military, as well as an American court-martial proceeding at the end of the Revolutionary War, suggest that at the Founding, the term "land and naval Forces" was understood to encompass inactive-duty personnel who remained obligated to obey military orders, including orders to serve again if called. Such inactive-duty soldiers, in other words, were regarded as having "military status."

We begin with the pre-Revolutionary example of "half-pay officers." In the seventeenth century, in recognition of prior service, the British government began paying certain officers a reduced salary in peacetime. *See* JOHN CHILDS, THE BRITISH ARMY OF WILLIAM III, 1689–1702, at 70 (1987). Half-pay officers were allowed to live otherwise ordinary civilian lives but had to return to active-duty service if ordered. *See* N.A.M. Rodger, *Commissioned Officers' Careers in the Royal Navy, 1690–1815*, 3 J. FOR MAR. RSCH. 85, 90–91 (2001). After 1714, all British officers became eligible to participate in this system, which fed the rise of a burgeoning corps of officers who made lifelong careers in the military. "By mid-century long service had become the norm," and the half-pay system was a recognizable feature of British military culture. JOHN BREWER, THE SINEWS OF POWER 56 (1989).

19

When compared to active-duty soldiers, half-pay officers' connections to Britain's armed forces were quite sparse. Aside from their diminished pay, their only connection to the military was their ongoing service obligation.[6] Nevertheless, throughout the eighteenth-century, Parliament consistently described these half-pay officers as part of "his Majesty's land forces and marines." 9 Geo. 2 ch. 34, § 21; *see also* THE ANNALS OF KING GEORGE, YEAR THE THIRD 153 (1718) (describing funds appropriated for "Half-pay to the Officers of the Land Forces and Marines disbanded" after the Jacobite uprising of 1715). In 1758, Edmund Burke's *Annual Register* reported that Parliament had set aside funds for the "widows of such reduced officers of the land forces and marines, as died upon the establishment of half-pay." 1 ANNUAL REGISTER 128 (Edmund Burke ed., 4th ed. 1764) (1758). Decades later, the House of Commons directed one of its committees to estimate the cost of "Half Pay and Allowances [for] the Reduced Officers of His Majesty's [North] American Forces" for the coming year. 50 JOURNAL OF THE HOUSE OF COMMONS [1794–95], at 84 (c. 1795).

Although British half-pay officers were recognized as having military status, across the eighteenth century there was considerable debate about whether these officers should be subjected to the jurisdiction of peacetime courts-martial. Some half-pay officers were court-martialed in the early 1700s under the Mutiny Act adopted in 1689. *See* 1 JOHN MCARTHUR, PRINCIPLES AND PRACTICE OF NAVAL AND MILITARY COURTS MARTIAL 190 (1805) ("[O]fficers on half pay were originally

---

[6] While all half-pay officers were in principle subject to recall, "[o]fficers were retained on the list who were known to be incapable and even insane because no other support for their old age was available." Rodger, 3 J. FOR MAR. RSCH. at 91. For such officers, the half-pay system was a de facto retirement.

20

deemed, though not in actual service, to be subject to martial law."); *cf. Loving*, 517 U.S. at 761–65 (discussing the Mutiny Act's history). After realizing that the Act's terms furnished uncertain legal grounds for those proceedings, Parliament amended the Act in 1748 to make clear that half-pay officers were subject to court-martial jurisdiction.[7] 22 Geo. 2 c. 5; *see* 1 MCARTHUR at 189–92; HARRIS PRENDERGAST, THE LAW RELATING TO OFFICERS IN THE ARMY 25 (1855).

Soon thereafter, public opposition forced Parliament to reverse course, and the Act's jurisdiction-extending provision was repealed. In 1785 the Court of Exchequer Chamber weighed in, finding that half-pay officers did not come within the scope of the Mutiny Act's original terms. *See* 1 MCARTHUR at 195–96; PRENDERGAST at 25; JOHN DELAFONS, A TREATISE ON NAVAL COURTS MARTIAL 62–63 (1805). But that judicial decision did not limit the legislature's authority to subject half-pay officers to military jurisdiction: one year later, Parliament again amended the Mutiny Act to encompass half-pay officers with brevet rank. *See* 1 MCARTHUR at 201. Thus, although it was contested throughout the eighteenth century whether half-pay officers should be legislatively subject to court-martial

---

[7] The amendment provided:

> And whereas it may be otherwise doubted, whether … the reduced Officers of His Majesty's Land Forces and Marines on the British and Irish Establishment of Half Pay, be within the Intent and Meaning of this Act, … it is hereby enacted by the Authority aforesaid, That the … reduced Officers of His Majesty's Land Forces and Marines, on the British and Irish Establishments of Half Pay, be at all Times subject to all the Penalties and Punishments mentioned in this Act.

22 Geo. 2 c. 5.

21

jurisdiction, it was beyond controversy that they were part of Britain's armed "forces" amenable to military jurisdiction.[8]

The Americans who ratified the Constitution were familiar with the structure of the British military generally, and with the half-pay system specifically. Indeed, some of the Continental Army's most prominent leaders had been half-pay officers in the years before independence—Charles Lee of Virginia, for instance. *See* 1 PAPERS OF GEORGE WASHINGTON, REVOLUTIONARY WAR SERIES 18 n.4 (Philander D. Chase ed., 1985). During the Revolutionary War, the Continental Congress pledged on more than one occasion that after hostilities ceased, retired American officers would be given half pay, just like their British counterparts.[9] *See* 11 JOURNALS

---

[8] After oral argument, Larrabee directed us to an unpublished article arguing that military retirees do not fall within the original meaning of "the land and naval Forces" in the Make Rules Clause. *See* Marc J. Emond, Can Grandpa Really be Court-Martialed? The Constitutionality of Imposing Military Law upon Retired Personnel (2022) (LL.M. dissertation, JAG Legal Ctr. & Sch.), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4089746. Emond argues that at the Founding, the American Articles of War permitted only the court-martialing of active-duty personnel: those Articles were modeled on the British Mutiny Act, and by 1787, the Mutiny Act had not expressly authorized the court-martialing of half-pay officers for over thirty years. *See id.* at 27–28. But given that Parliament had subjected half-pay officers to court-martial jurisdiction earlier in the eighteenth century, and that its *authority* to do so was not disputed, the scope of the Founding-era Articles of War is not dispositive of the Constitution's original meaning. The fact that Congress chose not to subject inactive-duty personnel to court-martial jurisdiction does not settle whether Congress had the authority to do so under the Make Rules Clause.

[9] Because of the federal government's financial difficulties after the Revolutionary War, those plans did not ultimately materialize. The

22

OF THE CONTINENTAL CONGRESS, 1774–1789, at 502–03
(Worthington Chauncey Ford ed., 1908) [hereinafter
JOURNALS]; 18 *id.* at 960–61. In 1781, Congress directed the
Continental Army to place certain redundant officers in half-
pay status and to make them amenable to involuntary recall.
*See* 21 *id.* at 1180. The idea that an inactive-duty soldier might
be part of the Continental Army's "forces" was therefore not
foreign to Founding-era Americans.

Indeed, a notable historical episode confirms that in the
early American Republic inactive-duty troops were understood
to be part of "the land and naval Forces."[10] The Continental
Congress was authorized to "mak[e] rules for the government
of the said land and naval forces." ARTICLES OF
CONFEDERATION of 1781, art. IX, para. 4. To be court-
martialed under the laws adopted by the Continental Congress,
therefore, a person had to belong to the "land and naval forces."
Towards the end of the Revolutionary War, Congress elected
to furlough indefinitely most soldiers in the Continental Army,
with the understanding that they would be fully discharged
after a peace with Britain was concluded. *See* 24 JOURNALS at
269–71, 364–65, 390. Pursuant to that directive, in 1783
George Washington instructed his officers to furlough their
troops—to issue what were, in effect, conditional discharge

---

United States' military retirement system dates from the mid-
nineteenth century, and Congress has subjected military retirees to
court-martial jurisdiction since that time. *See* J. Mackey Ives &
Michael J. Davidson, *Court-Martial Jurisdiction over Retirees under
Articles 2(4) and 2(6): Time to Lighten Up and Tighten Up?*, 175
MIL. L. REV. 1, 3–5, 11–12 (2003).

[10] We owe this historical argument to Judge Maggs. *See Begani*, 81
M.J. at 284–85 (Maggs, J., concurring).

23

papers.[11] Between their furlough in June and their eventual discharge in October, these troops were not in active-duty service and were allowed to return indefinitely to civilian life. *See* Alexander W. Armour, *Revolutionary War Discharges*, 21 WILLIAM & MARY Q. 344, 353–57 (1941); 25 JOURNALS at 702–03.

We know that these inactive-duty soldiers were part of the "land and naval forces" because, while they were furloughed, some were court-martialed. *See* Mary A.Y. Gallagher, *Reinterpreting the "Very Trifling Mutiny" at Philadelphia in June 1783*, 119 PENN. MAG. OF HIST. & BIOG. 3, 28 (1995). In June 1783, a large contingent of them—angry they had not been paid their full wages—staged a violent protest in Philadelphia, forcing the Continental Congress to evacuate the city. From Princeton, Congress directed the Army's leadership to take "immediate measures … to confine and bring to trial all such persons belonging to the army as have been principally active in the late mutiny." 24 JOURNALS at 412–13. After restoring order, some of them were court-martialed for mutiny.[12] *See* 25 JOURNALS at 565–66.

Later, the Continental Congress intervened to pardon the convicted soldiers. *Id.* While Congress knew that many of these soldiers had received furloughs before the mutiny, it never challenged the court-martial's power to try them; indeed, it had

---

[11] These papers provided: "The within CERTIFICATE shall not avail the Bearer [of] a Discharge, until the Ratification of the definitive Treaty of Peace; previous to which Time, and until Proclamation thereof shall be made, He is to be considered as being on Furlough." *Reprinted in* Alexander W. Armour, *Revolutionary War Discharges*, 21 WILLIAM & MARY Q. 344, 354–55 (1941).

[12] Under the Articles of War then in effect, only a "soldier or officer" could be tried for mutiny. Articles of War of 1776, § 2, art. 3, *reprinted in* 5 JOURNALS at 789.

24

ordered their trial. Henry Knox, the Secretary of War, voiced
no objection to the proceedings. *See Begani*, 81 M.J. at 285 n.2
(Maggs, J., concurring) (citing 33 JOURNALS at 666–67). And
in his later narration of the episode, John Marshall never
questioned the military tribunal's jurisdiction. *See* 4 JOHN
MARSHALL, THE LIFE OF GEORGE WASHINGTON 614–18
(1805). Although these furloughed soldiers were not currently
in active duty, and would likely never serve again, Founding-
era observers evidently had no difficulty conceiving of them as
part of the "land and naval forces" whose members could be
court-martialed.

\* \* \*

The scope of court-martial jurisdiction under the Articles
of Confederation incorporated the settled meaning of "land and
naval forces" that the revolutionaries inherited from their
experience as British subjects. *Cf.* Felix Frankfurter, *Some
Reflections on the Reading of Statutes,* 47 COLUM. L. REV. 527,
537 (1947) ("[I]f a word is obviously transplanted from another
legal source … it brings the old soil with it."). In drafting the
Constitution, "the Framers recognized and sanctioned existing
military jurisdiction by exempting from the Fifth
Amendment's Grand Jury Clause all 'cases arising in the land
or naval forces'" and "by granting [Congress] power 'to make
Rules for the Government and Regulation of the land and naval
Forces.'" *Ortiz*, 138 S. Ct. at 2175 (cleaned up). In other words,
those persons who were in the "land and naval forces" under
the Articles and who could therefore be court-martialed
remained so under the Constitution.

In eighteenth-century Britain and the post-revolutionary
United States, "the land and naval forces" comprehended not
only active-duty soldiers, but inactive-duty ones as well. Half-
pay officers were part of "his Majesty's land forces and

25

marines" because they had a relationship with the military that entailed an obligation to serve again, if called. The furloughed soldiers court-martialed in Philadelphia were part of the American "land and naval forces," and for the same reason. These historical examples confirm that a person who has a formal relationship with the military that includes an obligation to obey military orders is part of the "land and naval Forces," as that phrase was understood at the Founding. Because such persons are "actually members or part of the armed forces," the Make Rules Clause permits Congress to subject them to court-martial jurisdiction. *Toth*, 350 U.S. at 15.

## VI.

Based on the foregoing, it is sufficient for a person to fall within the "land and naval Forces" if he has a formal relationship with the armed forces that includes a duty to obey military orders. Applying that test of military status here, we conclude that members of the Fleet Marine Reserve are a part of the "land and naval Forces" and therefore that Larrabee's court-martial was constitutional.

### A.

Larrabee voluntarily joined the Marine Corps in 1994. As an active-duty Marine, he was unquestionably in the armed forces and amenable to court-martial jurisdiction. After serving in active duty for twenty years and attaining the rank of Staff Sergeant, he elected to transfer to the Fleet Marine Reserve. In practice he became a retiree, but he maintained a legal relationship with the armed forces. As a Fleet Marine Reservist, he assumed an obligation to obey, "without his consent," an order to reenter active-duty service during a "war or national emergency declared by Congress," a "national emergency declared by the President," or as "otherwise authorized by law." 10 U.S.C. § 8385(a); *see also id.* § 688(a)–

26

(b). These service obligations are central to the identity of the Fleet Marine Reserve, whose basic "purpose … is to maintain a ready manpower pool of trained Marines for recall and mobilization." MCO 1900.16 ¶ 7001.2. In addition to this duty to reenter active service, if ordered, Larrabee was also "required" to report to "active duty for training" for up to two months in any four-year period. 10 U.S.C. § 8385(b). Finally, he was subject to employment restrictions, as well as military reporting requirements.[13]

Through his membership in the Fleet Marine Reserve, Larrabee had legally bound himself to the armed forces and assumed a duty to obey military orders. He therefore had a "military status" and was properly subject to court-martial jurisdiction. *Solorio*, 483 U.S. at 439; *see also Guagliardo*, 361 U.S. at 287 (private military contractor lacked "military status" and so could not be court-martialed); MCO 1900.16 ¶ 1002.20 (discharged soldiers, who may not be court-martialed under *Toth*, lack "all military status").

B.

This conclusion is consistent with the settled position of the CAAF, which has long recognized military retirees as amenable to court-martial. *See Pearson v. Bloss*, 28 M.J. 376, 379 (C.M.A. 1989) (upholding military jurisdiction over retired personnel in the Air Force); *United States v. Overton*,

---

[13] Our dissenting colleague maintains that until members of the Fleet Marine Reserve are recalled to active duty, "their day-to-day lives are equivalent to those of ordinary civilians." Dissenting Op. 3. As a practical matter, this is undoubtedly true. As a formal legal matter, however, they continue to retain "military status," even if not all the responsibilities of active-duty servicemembers. In times of emergency and war, Fleet Marine Reservists must answer the call to serve, whereas civilians may choose to stay home.

27

24 M.J. 309, 311 (C.M.A. 1987) (same, for members of the Fleet Marine Reserve). It reaffirmed that view last year in *United States v. Begani*, holding that "retired members of the armed forces"—including "members of the … Fleet Marine Reserve"—are "part of the 'land and naval Forces'" whose members may be constitutionally court-martialed. 81 M.J. at 276, 279, *cert. denied*, 142 S. Ct. 711 (2021). In particular, the CAAF's decision rested on the fact that Begani, a naval Fleet Reservist, (1) "receive[d] ongoing retainer pay" because he was a "current member[] of the armed forces, though not on active duty," and (2) was "require[d] [to] maintain readiness for future recall." *Id.* at 278 (emphasis removed). We note also that the only Article III court of appeals to have considered whether military retirees may be court-martialed reached the same result. *See United States ex rel. Pasela v. Fenno*, 167 F.2d 593, 595 (2d Cir. 1948) (holding that a naval Fleet Reservist could be court-martialed and pointing to the fact that he "remain[ed] subject to call to active duty"); *cf. Hooper v. United States*, 326 F.2d 982, 986–87 (Ct. Cl. 1964) (similar).

C.

Our conclusion that Fleet Marine Reservists are in "the land and naval Forces" is further reinforced by the fact that, in other contexts not raising the constitutional question presented here, the Supreme Court has recognized military retirees as part of the nation's armed forces. *Barker v. Kansas*, for instance, concerned whether military retirees' benefits should be taxed as a pension for past service or as "current pay for current services." 503 U.S. 594, 600 (1992). In resolving that dispute, the Court explicitly confirmed that "[m]ilitary retirees unquestionably remain in the service and are subject to restrictions and recall." *Id.* at 599. In the similar case of *McCarty v. McCarty*, the Court noted that "[t]he retired officer remains a member of the Army, … continues to be subject to

28

the Uniform Code of Military Justice, … may forfeit all or part of his retired pay if he engages in certain activities," and "remains subject to recall to active duty by the Secretary of the Army at any time." 453 U.S. 210, 221–22 (1981) (cleaned up). In *Kahn* the Court flatly rejected the argument that, because "retired officers" are not in the armed forces, they may not sit on court-martial panels: "it is not open to question … that such officers are officers in the military service of the United States." 255 U.S. at 6–7.

Indeed, as early as 1881, in *United States v. Tyler*, the Court found that while retirees are "not required to perform full service, they are [still] part of the army, and may be assigned to such duty as the laws and regulations permit." 105 U.S. 244, 245 (1881); *cf. Thornley v. United States*, 113 U.S. 310, 315 (1885) ("The point on which [*Tyler*] turned was … that an officer of the army, though retired, was still in the service."). Finally, the Supreme Court and this court's predecessor have both affirmed court-martial sentences imposed on military retirees without questioning the constitutionality of the military proceedings. *See United States v. Fletcher*, 148 U.S. 84 (1893); *United States v. Page*, 137 U.S. 673 (1891); *Closson v. United States ex rel. Armes*, 7 App. D.C. 460 (1896).

As already noted, the Court has not squarely addressed whether military retirees, such as members of the Fleet Marine Reserve, may be court-martialed consistent with the Constitution. Nevertheless, the Court's consistent and repeated acknowledgement that military retirees are properly regarded as members of the armed forces, rather than civilians, substantiates our conclusion that Fleet Marine Reservists fall within the "land and naval Forces" governed by the Make Rules Clause.

29

\* \* \*

Because he maintained a relationship with the armed forces and was obligated to obey military orders at the time of his court-martialing, Larrabee was in "the land and naval Forces" and constitutionally subject to court-martial jurisdiction.

VII.

Larrabee offers five reasons why Fleet Marine Reservists may not constitutionally be court-martialed. None are availing.

First, pointing to *Singleton*, Larrabee argues that we must apply a flexible, functional test to determine whether members of the Fleet Marine Reserve "can be regarded as falling within the term 'land and naval Forces.'" 361 U.S. at 241. The salient constitutional question, in his view, is whether the person tried at court-martial "has any authority or obligation to act in a military capacity." This inquiry requires a case-by-case analysis of whether the accused possesses the "substantive authorities or responsibilities … relevant to the preservation of good order and discipline among troops in active service." Larrabee would have us consider factors such as: Can the accused wear a uniform? Can he give orders? Must he obey orders? Must he meet the military's physical fitness requirements? When all these factors are taken together, Larrabee argues, Fleet Marine Reservists resemble civilians far more than soldiers. A stand-alone duty to return to service, he insists, is not enough to satisfy this functional test.

When determining the scope of "the land and naval Forces," the Supreme Court has never resorted to the kind of complex multifactor test that Larrabee proposes. In the 1960s the Court adopted a balancing test, akin to Larrabee's, for determining which *offenses* could be prosecuted at court-

30

martial. Under *O'Callahan v. Parker*, 395 U.S. 258 (1969), courts were required to weigh a "myriad of factors … in determining whether an offense is service connected," including the nature of the offense, the status of the victim, and the location of the crime. *Solorio*, 483 U.S. at 448. The Court has since squarely rejected that approach, holding that the permissible scope of court-martial jurisdiction turns "on *one* factor: the military status of the accused." *Id.* at 439 (emphasis added). To determine the status of a person tried at court-martial, the Court has consistently analyzed whether he has a legal relation to the military that entails an obligation to obey military orders—or whether, by contrast, he is a "civilian[] … entitled to [the] safeguards afforded … by Article III of the Constitution." *Toth*, 350 U.S. at 23. We therefore reject Larrabee's multifactor balancing test for differentiating civilians from military personnel.

Second, relying on the district court's analysis below, Larrabee argues that even if Fleet Marine Reservists are in the armed forces, that is not sufficient to permit their court-martialing under the Make Rules Clause. Subjecting them to the military courts' jurisdiction, the district court held, must also be "necessary to maintain good order and discipline" in the ranks. *Larrabee*, 502 F. Supp. 3d at 331 (citing *Toth*, 350 U.S. at 22). Because members of the Fleet Marine Reserve are unlikely to be recalled, the exercise of court-martial jurisdiction over them is not necessary and so is unconstitutional.

That objection misses the mark. In *Toth*, the Court did not hold that persons in the armed forces may be court-martialed only in cases of military necessity. Rather, it held that that an ex-serviceman who is now a *civilian* may not be court-martialed for crimes committed while in military service. In reaching that conclusion, the Court rejected the suggestion that

31

the Necessary and Proper Clause could stretch the Make Rules Clause to cover civilians who did not fall within the letter of "the land and naval Forces." *See Toth*, 350 U.S. at 21–22; *see also Covert*, 354 U.S. at 20–21. And it noted in passing that "[f]ree countries of the world have tried to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service." *Toth*, 350 U.S. at 22. But this general statement appeared in the context of the Court's sharp distinction between civilians and servicemembers. The *Toth* Court drew a line between civilians receiving the full protections of Article III and persons within the armed services subject to military trial. Contrary to Larrabee's claims, the Court did not impose limits on court-martial jurisdiction over those persons who had a "military status" and were actually within "the land and naval Forces."

Third, Larrabee and amici protest that members of the Fleet Marine Reserve are subject to only one duty—namely, a duty to return to active-duty service, if called—and that such a self-standing duty is not enough, because a person may be court-martialed only if he is legally obligated to obey *more than one* military order. We fail to see why a servicemember who must obey one order is less a part of "the land and naval Forces" than his peer who must obey two.[14] *Cf. id.* at 17 ("[I]t is the primary business of armies and navies to fight *or be ready to fight wars should the occasion arise*.") (emphasis added). In any event, Larrabee's repeated assertion that Fleet Marine

---

[14] Our dissenting colleague agrees that "whether individuals are subject to court-martial jurisdiction turns on their military status," but insists that "a recall order" is not "like any other military order." Dissenting Op. 1. The dissent does not explain why the scope of the Make Rules Clause turns on the kind of military order to which a person is subject, or why a legal obligation to serve if recalled is not enough to place one in "the land and naval Forces."

32

Reservists have only "one duty" fails to account for their multiple military obligations, which include a duty to return to service, if called, a duty to report to active duty for training in peacetime, and a duty to comply with the military's employment and reporting regulations.

Fourth, Larrabee contends that if members of the Fleet Marine Reserve fall within the scope of the Make Rules Clause, then if Congress reauthorized a compulsory draft, every person presently registered with the Selective Service would become subject to court-martial—before they had ever been inducted into the military, donned a uniform, or received an order.[15] Consistent with its authority under the Army and Navy Clauses, Congress may require men on the Selective Service list to serve in the military. *See Arver v. United States*, 245 U.S. 366, 377 (1918). Yet, while those who have been drafted may be constitutionally court-martialed, the Court has never implied that those *yet to be drafted* may also face military justice. Before a Selective Service registrant has been ordered to serve, he has no military status—no current "relationship with the military and its institutions," only a prospective one. *Toth*, 350 U.S. at 14; *cf. Billings*, 321 U.S. at 546 (affirming, in dicta, the constitutionality of a statute that authorized military jurisdiction over persons "lawfully called, drafted, or ordered into [the armed forces] *from the dates they are required by the terms of the call, draft or order to obey the same*") (emphasis added) (quoting Articles of War of 1920, Pub. L. No. 66-242, art. 2(a), 41 Stat. 787, 787). Only after being ordered into service does a draftee become part of "the land and naval Forces" whose members may be court-martialed. *See id.* at 556. Before being a drafted, by contrast, he has no ongoing

---

[15] "[E]very male citizen of the United States … between the ages of eighteen and twenty-six" is required to register with the Selective Service. 50 U.S.C. § 3802(a).

33

relationship with the military that obliges him to obey military orders. Larrabee's *reductio ad absurdum* therefore fails to show that Fleet Marine Reservists must fall outside of the Make Rules Clause.

Finally, Larrabee argues that as a matter of policy, "there is simply no good argument for why … military retirees need to be subject to the UCMJ while they are retired." Larrabee and his amici point out that courts-martial lack many of the constitutional protections afforded in Article III courts, and that the UCMJ's procedural safeguards are grants of legislative grace and not guaranteed as a matter of constitutional right. These features, however, are part of the established operation of military justice under our Constitution. *Cf. Parker v. Levy*, 417 U.S. 733, 744 (1974) ("[T]he military constitutes a specialized community governed by a separate discipline from that of the civilian, and … the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty.") (cleaned up).

Our dissenting colleague emphasizes the centrality of the right to a trial by jury under our Constitution, Dissenting Op. 1–2, and we of course recognize the importance of the jury system in the Article III courts. Nevertheless, it is not this court that has extended court-martial jurisdiction, but Congress. Although the judiciary must determine whether military retirees like Larrabee actually have "military status," the question of whether subjecting them to court-martial jurisdiction is wise or foolish is for the political branches to decide.[16]

---

[16] As the Supreme Court has emphasized, "Congress has the primary responsibility for the delicate task of balancing the rights of servicemen against the needs of the military." *Solorio*, 483 U.S. at

34

VIII.

Larrabee argues in the alternative that the Grand Jury Clause separately barred his court-martial. He maintains that an inactive-duty servicemember may not be tried by a military tribunal for an offense that is unrelated to military order and discipline, because such a "case[]" does not "aris[e] in the land or naval forces." U.S. CONST. amend. V. In his view, the government therefore violated the Grand Jury Clause by court-martialing him for the sexual assault of a civilian while he was an inactive-duty Fleet Marine Reservist. We disagree.

The Supreme Court has already rejected this argument. In *Solorio*, it categorically renounced the service-connection test set out in *O'Callahan*, making clear that "the Constitution … condition[s] the proper exercise of court-martial jurisdiction over an offense on one factor: the military status of the accused." 483 U.S. at 439. Larrabee argues that *Solorio* did not eliminate *O'Callahan*'s service-connection test requirement for inactive-duty servicemembers, and that the Grand Jury Clause requires one. But *Solorio*'s holding was not limited to active-duty troops. Rather the Court held that, as a general matter, "determinations concerning the scope of court-martial jurisdiction over offenses committed by servicemen [are]

---

447. The Executive Branch also must balance these concerns in the exercise of its prosecutorial discretion. The Army, for instance, has historically adhered to a "policy that retired personnel subject to the [UCMJ] will not be tried for any offenses by any military tribunal unless extraordinary circumstances are present linking them to the military establishment or involving them in conduct inimical to the welfare of the nation." 7 JUDGE ADVOCS. GEN., DIGEST OF OPINIONS [1957–58] 108 (1958).

35

reserved for Congress" and are not to be second-guessed by courts.[17] *Id.* at 440.

Moreover, as the Court explained in *Covert*, the Fifth Amendment's "exception … for 'cases arising in the land or naval forces' was undoubtedly designed to correlate with the power granted Congress to provide for the 'Government and Regulation' of the armed services." 354 U.S. at 22. In other words, the Grand Jury Clause does not limit Congress' powers under the Make Rules Clause. *Cf. Ex parte Milligan*, 71 U.S. 2, 138 (1866) (Chase, C.J., concurring) (observing that the Grand Jury Clause's "exception [has] the same import and effect as if the powers of Congress in relation to the government of the army and navy and the militia had been

---

[17] We note that even if some type of service connection were required when the government seeks to court-martial an inactive-duty servicemember, Larrabee was still properly subject to court-martial jurisdiction. While his offenses were civilian in nature and committed against a civilian on private property, they were undoubtedly service-connected under *O'Callahan*. Indeed, it is difficult to imagine how the sexual assault of a forward-deployed, active-duty Marine's wife by a retired Marine could *not* impair military order and discipline. In fact, in this case it did: after Larrabee's assault came to light, his victim's husband was reassigned from Japan to the United States.

The facts in *Solorio* were very similar. There, a coastguardsman was accused of sexually abusing the minor children of his fellow coastguardsmen on private property. Before the case reached the Supreme Court, the Court of Military Appeals (the CAAF's precursor) upheld the conviction under *O'Callahan*'s service-connection test, reasoning that the sexual abuse of servicemembers' civilian dependents has "a continuing effect on the victims and their families and ultimately on the morale of any military unit or organization to which the family member is assigned." *United States v. Solorio*, 21 M.J. 251, 256 (C.M.A. 1986); *see also Solorio*, 483 U.S. at 451 (Stevens, J., concurring in the judgment). So too here.

36

recited in the [Fifth] [A]mendment, and cases within those powers had been expressly excepted from its operation"). Congress' authority to govern and regulate persons in the armed forces is "plenary," and Larrabee offers no compelling reason why the Grand Jury Clause constrains that authority in the case of inactive-duty troops. *Solorio*, 483 U.S. at 441.

As the text and structure of the two clauses confirm, the scope of the Grand Jury Clause's exception is coextensive with that of the Make Rules Clause. Because Larrabee was in "the land and naval Forces" at the time of his court-martialing, U.S. CONST. art. I, § 8, cl. 14, his "case[] ar[ose] in the land or naval forces," U.S. CONST. amend. V.

\* \* \*

Military trials are constitutional only for those who have a military status. Because the exercise of court-martial jurisdiction limits the constitutional protections of Article III courts, we must independently determine whether a person is in "the land and naval Forces" or is a civilian. The Supreme Court's precedents interpreting the Make Rules Clause, as well as historical evidence from the Founding era, both indicate that Congress may extend court-martial jurisdiction over a person if he has a formal relationship with the military that includes a duty to obey military orders. Larrabee had the requisite military status because at the time of his arrest he was a member of the Fleet Marine Reserve and was subject to ongoing military duties. The judgment of the district court is therefore

*Reversed.*

TATEL, *Circuit Judge*, concurring in part and dissenting in part: I agree with my colleagues about everything except what matters most: their conclusion. I agree that whether individuals are subject to court-martial jurisdiction turns on their military status and that the unifying pattern in Supreme Court precedent "is that the persons found to be properly within 'the land and naval Forces' had a formal relationship with the military that included an obligation to obey military orders." Majority Op. at 13. I also agree with Judge Rao that we owe Congress no deference in interpreting the scope of the Make Rules Clause. That said, I disagree that the type of order to which Larrabee is potentially subject—a recall order summoning him from civilian life to take up arms—is like any other military order. By treating it as such, the court extends court-martial jurisdiction not only to the Fleet Marine Corps Reserve, but also to roughly two million military retirees. Because this dramatic expansion of court-martial jurisdiction is beyond what the Constitution allows and case law supports, I respectfully dissent from that portion of the court's opinion.

The court is of course correct that this case is about the Make Rules Clause. But we must interpret that clause in the context of the rest of the Constitution, which puts a heavy thumb on the scale against extending court-martial jurisdiction. The Constitution guarantees the right to juries not once, not twice, but four times.

> Article III: "The Trial of all Crimes, except in Cases of Impeachment, shall be by *Jury*."

> Fifth Amendment: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a *Grand Jury*, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger."

2

> Sixth Amendment: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial *jury*."

> Seventh Amendment: "In Suits at common law . . . the right of trial by *jury* shall be preserved."

(Emphases added.)

By contrast, the Constitution has nothing at all to say about court-martial jurisdiction. The Supreme Court inferred this "very limited and extraordinary jurisdiction . . . from the cryptic language in" the Make Rules Clause. *Reid v. Covert*, 354 U.S. 1, 21 (1957) (plurality opinion). Its justification for allowing courts-martial is straightforward. As it explained in *United States ex rel. Toth v. Quarles*, "[c]ourt-martial jurisdiction sprang from the belief that within the military ranks there is need for a prompt, ready-at-hand means of compelling obedience and order." 350 U.S. 11, 22 (1955). In *Toth*, the Court held that a discharged soldier could not be court-martialed because "[i]t is impossible to think that the discipline of the Army is going to be disrupted, its morale impaired, or its orderly processes disturbed, by giving ex-servicemen the benefit of a civilian court trial when they are actually civilians." *Id.* Two years later, in *Reid v. Covert*, the court extended *Toth* to military dependents who commit crimes on military bases, holding that they too cannot be court-martialed because such conduct bears even less on "the maintenance of order and discipline in the armed forces than the conduct of" discharged soldiers. 354 U.S. at 32; *see also Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 248–49 (1960) (extending *Covert*'s reasoning to noncapital offenses committed by military dependents).

3

Surveying Supreme Court precedent, my colleagues point out that only individuals with "a formal relationship with the military that include[s] an obligation to obey military orders" are "properly within 'the land and naval Forces.'" Majority Op. at 13. This makes sense given that the need for military order and discipline is what justifies subjecting military personnel to courts-martial. Individuals not subject to military orders are not an "'important'" part of the military "'machinery'" that depends on swift military justice to maintain good order and discipline. *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281, 285 (1960) (quoting *Ex parte Reed*, 100 U.S. 13, 21–22 (1879)).

Although the duty to obey military orders is a necessary condition for court-martial jurisdiction, it does not follow that the possibility of a recall order is sufficient to subject members of the Fleet Marine Corps Reserve to such jurisdiction. If the military issues an order recalling one or more members of the Fleet Marine Corps Reserve, they will be reincorporated into the military chain of command and subject to military discipline and court-martial. But until then, their day-to-day lives are equivalent to those of ordinary civilians. No need to take my word for it. Ask the military, which routinely excludes the Fleet Marine Corps Reserve from the requirements it deems necessary to maintain the armed forces. Members of the Fleet Marine Corps Reserve are unassigned to a specific command, are ineligible for promotion, lack authority to issue binding orders, may refer to their rank and wear their uniforms only under limited conditions, need not participate in military activities, need not maintain any level of physical fitness, and may not serve on or refer charges to courts-martial. And especially significant, although the Marine Corps requires all "active and reserve component" members to be vaccinated against COVID-19 because "a fully vaccinated force is a matter of operational readiness and good order and discipline," it has

4

not extended this requirement to members of the Fleet Marine Corps Reserve. *See* MARADMINS 462/21 (Sept. 1, 2021) (first quote); MARADMINS 612/21 (Oct. 23, 2021) (second quote). The military itself obviously considers the Fleet Marine Corps Reserve to lie outside the "force" where "good order and discipline" are essential.

A recall order, then, functions as a gateway to military status. The possibility of such an order certainly means that the military status of members of the Fleet Marine Corps Reserve *could* change, but not that they are currently part of the armed forces. Before receiving any such order, they are entitled to all jury rights guaranteed by the Constitution. "It is impossible to think that the discipline of the [Marine Corps] is going to be disrupted, its morale impaired, or its orderly processes disturbed" by providing members of the Fleet Marine Corps Reserve with an Article III jury trial. *Toth*, 350 U.S. at 22.

Neither English nor American history requires otherwise. Like our Supreme Court, Blackstone observed that "[t]he necessity of order and discipline in an army is the only thing which can give [court-martial jurisdiction] countenance." 1 William Blackstone, *Commentaries* *400. The Founders so resented Britain's curtailment of the right to jury trial that military tribunals received special condemnation in the Declaration of Independence, which denounced King George III's efforts "to render the Military independent of and superior to the Civil power" and chastised the Crown "[f]or depriving us in many cases, of the benefits of trial by jury." The Declaration of Independence para. 2 (U.S. 1776). Moreover, regardless of the turbid history of how individuals like members of the Fleet Marine Corps Reserve were treated prior to 1789, *see* Majority Op. at 18–24, the Constitution enshrined the right to trial by jury and curtailed the scope of courts-martial. In sum, our history reveals a "deeply rooted and

5

ancient opposition . . . to the extension of military control over civilians." *Covert*, 354 U.S. at 33.

The implications of this case stretch far beyond Larrabee and the Fleet Marine Corps Reserve. Millions of military retirees are also subject to military recall. 10 U.S.C. § 688(b). Indeed, as Larrabee's counsel pointed out at oral argument, under the court's reasoning "nothing would stop the Government from court-martialing a 90-year-old Korean War veteran, who retired after being injured in the war, for shoplifting a newspaper from his local supermarket." Oral Arg. 33:55–34:10. The 200-plus retired generals and admirals who spoke out against President Trump and the 120-plus now speaking out against President Biden could likewise be court-martialed. *See* 10 U.S.C. § 888 (subjecting military officers to court-martial for "us[ing] contemptuous words against the President"); Br. for Joshua E. Kastenberg & J. Wesley Moore as Amicus Curiae in Support of Appellee at 22–23.

The Supreme Court has repeatedly warned of the dangers of expanding court-martial jurisdiction. "Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections." *Covert*, 354 U.S. at 21; *see also Toth*, 350 U.S. at 15 ("[A]ny expansion of court-martial jurisdiction . . . necessarily encroaches on the jurisdiction of federal courts . . . where persons on trial are surrounded with more constitutional safeguards than in military tribunals."). As a result of today's decision, millions of Americans have lost one such constitutional right.